THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| COMMERCE COMMERCIAL PARTNERS, LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MILLIKEN & COMPANY, a Delaware corporation,<br><br>Defendant. | **MEMORANDUM DECISION AT THE END OF EVIDENCE IN PHASE 1 OF TRIAL**<br><br>Case No. 4:22-cv-00020-DN-PK<br><br>District Judge David Nuffer<br><br>Magistrate Judge Paul Kohler |

The first phase of trial began on Tuesday June 25, 2024, and continued until and including Tuesday July 2, 2024. Both parties rested. As ordered on June 4, 2024, a second phase of trial "will consider additional evidence and argument on issues inherent in attorneys' fee awards; issues arising under Utah Code Ann. § 78B-5-826; and any amount of attorneys' fees to be awarded."[1] This Memorandum Decision advises the parties of the fact findings and conclusions made thus far.

**Contents**

Preliminary ............................................................................................................. 2
Background ........................................................................................................... 2
    Landlord Tenant Relationships Generally ........................................... 2
    Relationship of these Parties ................................................................ 3
    Alteration Authorizations ..................................................................... 3
    The End of Milliken Production .......................................................... 4
    Deterioration of Relationships ............................................................. 4
Weight Given Evidence and Testimony ............................................................... 6
Determinations of Liability ................................................................................... 6
    Milliken breached its duty to repair and maintain ............................... 6
    Milliken breached its duty to give CCP access during the lease ......... 7

---

[1] Memorandum Decision and Order Denying Milliken's Motion on Limine No. 6 to Exclude Plaintiff's Claim For Attorneys' Fees and Granting [71] Motion on Limine Re: Plaintiff's Attorneys' Fees and Costs, at 21, docket no. 111, filed June 4, 2024.

Milliken made unauthorized alterations, some of which impaired the structural integrity of the building ........................................................................... 8
Milliken's penetrations of the Tilt Up walls and abuse of the mezzanine constitute waste ........................................................................................................ 8
Milliken is rightfully charged with the office HVAC unit replacement ................ 9
Milliken is responsible for six weeks Rent Abatement .......................................... 9
CCP provided notices of breach sufficient to trigger the 10% late fee ................ 10
CCP made no waiver ............................................................................................ 10
Milliken's payments and letters do not constitute settlements or complete cures 11
Questions and Discussion Friday July 5, 2024 ................................................................. 11
Who is the loading dock damage attributable to? ................................................ 11
Good faith and fair dealing .................................................................................. 11
The Issue of Interest ............................................................................................. 12
Damages ............................................................................................................... 12
Phase II Preparation ............................................................................................. 12

# Preliminary

All findings of facts are made by a preponderance of the evidence. The burden of proof is on CCP except for affirmative defenses and application of Utah Code Ann. § 78B-5-826.

This case had to be tried. There were too many facts, documents, and interpretations of facts and meaning and effect of lease provisions to decide the case without trial.

This document overviews the views of the fact finder, preliminary to preparation and entry of formal Findings of Fact and Conclusions of Law. It reviews the parties' relationship; decides key concepts related to liability; identifies remaining questions about the completed evidence presentation; and sets the stage for a discussion of damages, preparatory to determination of attorneys' fees. The document is a benchmark to moving forward. The findings and conclusions expressed are hard and fast, though the language is not. There will be opportunity to object to an eventual draft of more complete and formal Findings of Fact and Conclusions of Law.

# Background

**Landlord Tenant Relationships Generally**

Leases bring together two entities with divergent interests. The landlord has a long-term capital investment, while the tenant has a short-term need for space. To protect the interests of the tenant, a lease has provisions to protect the typical interests of each party. To protect the interests of the tenant, the lease contains provisions such as a guarantee of quiet enjoyment, a set rent schedule, and duties of the landlord to maintain specified items. To protect the interests of the landlord, a lease usually provides for rent payments, assurances of protection of the capital investment, and coverage of taxes and insurance by the tenant. Lease agreements must be examined, interpreted, and enforced with the balance of interests in mind. A tenant cannot have free license with the premises, and the landlord cannot deny a compliant tenant the legitimate use of the premises for the lease term.

**Relationship of these Parties**

These parties had different backgrounds. The Tenant Milliken is a large manufacturing concern and the Landlord CCP leases several different buildings to different tenants. The Landlord CCP built this structure for use by a predecessor entity (both of which are referred to as CCP) – until that use became financially disadvantageous. CCP designed and then used the Premises for light manufacturing, while Milliken's operation involved highly specialized production with heavy equipment installations which required Milliken to request authorization to make substantial changes. CCP, having built the structure and used it for a business operation, had a more personal interest with a greater financial stake than Milliken. The building was in essentially new condition when delivered to Milliken after a little over a year of light manufacturing use by the CCP-related entity.

Physical proximity is another difference between these parties. CCP's CEO lives in California, and he was closer than Milliken's management located in South Carolina. Each party had local representatives, but CCP's management took more opportunities to visit the Premises than Milliken's management.

CCP's representative was Kjeld Hestehave, who contracted the construction, operated the first business on the Premises, negotiated the Lease Agreement with Milliken, and personally invoiced each monthly rent notice. Milliken's senior management was located in South Carolina. Local Milliken plant managers had little authority for Milliken compared to that of Mr. Hestehave for CCP.

**Alteration Authorizations**

Section 14 of the Lease Agreement[2] requires CCP consent for Milliken to make, at its expense, "alterations, changes, replacements and additions in and to the Premises." The "structural integrity of the Facility shall not thereby be impaired." The "written consent of Landlord" is required but "shall not be unreasonably withheld . . . ." All such alterations, changes, replacements and additions made by Tenant shall, at the option of Tenant, become the property of Landlord or be removed by Tenant."

Authorizations 1[3] and 2[4] were signed relatively soon after execution of the Lease Agreement on May 6, 2006. Each of them propose treatment or disposition of Tenant alterations at the end of the lease term. The second Authorization has initials of the Landlord representative and one interlineation which makes construction requirements of Milliken. Both Authorizations were signed by the Milliken Plant Manager.

The third authorization[5] was a draft, never presented to Landlord or signed by either party. It was sent to CCP by Milliken's attorney in Word format after the parties' dispute emerged. It has a typewritten date of September 28, 2007, in the text, but the data file name bears the date October 10, 2008. No one testified that it was signed by either party or sent to CCP. The work

---

[2] Ex. 1 dated May 6, 2006.

[3] Ex. 2 dated May 31 and signed June 1, 2006.

[4] Ex. 3, dated June 12 and signed 15, 2006.

[5] Ex. 4.

contemplated in the third authorization – and actually made by Tenant without Landlord's permission – made the most significant changes to the building of all the authorizations. Some of these changes impaired the structural integrity of the Facility,

**The End of Milliken Production**

The parties' interests seriously diverged two years before the end of the lease term, when Milliken manufacturing stopped in mid-2019. Milliken advised CCP in late 2018[6] that production would cease. When production ceased, Milliken no longer produced revenue on the premises but wanted to use the leasehold to stage its equipment for resale. The Lease Agreement permitted "[t]he Premises [to] be used for any purpose related to the carrying on of Tenant's business." But the lack of occupancy by active production personnel resulted in less attention by Milliken to the Premises; eliminated the presence of Milliken employees; reduced Milliken's need to maintain equipment and facilities; and eventually resulted in the departure of a plant manager when a maintenance employee was left as Milliken's prime on-site representative for the last 18-24 months of the lease.

Hestehave was concerned about marketing the building to a new tenant and restoration of the building. He wrote to Dan Sistrunk, Milliken's Vice President of Global Sourcing. Sistrunk answered:

> The logic behind the month to month conversion and the 6 month notice was to give enough time for you to find a possible new lessee upon our notice of intent to exit and also give us enough time to exit and return the site to original condition if you found a new lessee. I would suggest you work with Paul Dodd on the return to original state dialogue for the plant."[7]

CCP had been prevented from entry into the building during Milliken production.[8] On July 16, 2019, after production ended Hestehave toured the building interior for the first time since lease inception. Hestehave walked the interior with Milliken's Sourcing Manager, Paul Dodd, responsible for liquidating equipment and winding down the plant. Dodd was based in South Carolina. Hestehave's personal notes were marked as Exhibit 15.[9] Hestehave was told the equipment would be gone by the end of 2019.[10] Hestehave noted many repairs needed for the Premises to be ready for a new Tenant. He marked some that he believed were the responsibility of Milliken.

**Deterioration of Relationships**

After Milliken ceased operations, Hestehave became concerned about finding a new Tenant. In October 2019, he asked Paul Dodd if the equipment was out. Dodd replied that the equipment

---

[6] Tr. 122-129.

[7] Ex. 8.

[8] Tr. 90:17-19; 93:10-17; 94:5-17; 95:17-97:21.

[9] Tr, 140-151.

[10] T. 158:11-18.

would not be out till March or April 2020.[11] Then in December Hestehave asked Dodd about screening off 40,000 sq. ft. for a potential tenant, reduce the lease term, to "reduce[] your responsibility to manage and restore."[12] Dodd denied the request stating "It is a little complicated but the bottom line is that the individual buying the equipment is not able to guarantee that he will have the equipment out by June [2020]."[13] Retaining sole possession and not reducing the lease term was entirely within Milliken's rights but was another point in the deterioration of relationships, as the time for inspections, assessments, and repairs was being reduced.

On January 12, 2020, six months after his tour of the building, Hestehave notified Dodd that extension or sublease by Milliken was not possible; pointed out the dangers of delays in repairs; asked about the equipment sale plans; and again, offered to offset the Milliken lease expense by partial occupancy or reducing the term.[14] Hestehave also pointed out the need for repairs:

> I want to be clear on my position regarding the lease and building condition at the end of the lease term. The building needs to be restored to the conditions outlined in the lease on or before the end of the lease term with all the equipment removed from the building. This should start immediately given the requirements of the lease. Please put a plan together and present it to me ASAP with a timeline and the start date for the restoration of the building.

Having seen the condition of the building in July 2019, six months earlier, and having become aware of the many needed repairs, Hestehave was concerned about reversion of the premises in proper condition.

On February 5, 2020, Hestehave notified Dodd that CCP had a new tenant and would soon sign a new lease.[15] He stated:

> This is to inform you that on Monday, February 10, 2020, I am signing a lease for the building starting June 1, 2021. Per the lease agreement the building needs to be put to the original state when you first leased the building. I need from you a schedule with dates as to when the restoration will start and finish. In the inspection of the building from an outside contractor it has come to my attention that the mezzanine needs to be replaced. The metal holding up the concrete has rusted through . I have contacted a Civil/Structural Engineer and they informed me that it's not repairable. The replacement of the mezzanine and all other repairs must commence ASAP to ensure all repairs are completed by the end of your lease.

Two months later, having heard nothing, Hestehave emailed Dodd about a lender's inspection and also stating: "I have not seen a schedule from you as to the repair of the building. I need this

---

[11] Ex. 16.

[12] Ex. 21.

[13] Ex. 22.

[14] Ex. 23.

[15] Ex. 24.

ASAP." Dodd gave permission for the inspection and stated: "We are working on having someone investigate the issues with the mezzanine."[16]

By this time, the divergence of interests was set, but later ripened as Milliken, the tenant in possession, delayed and then abdicated responsibility for repairs and maintenance, acting without regard for the responsibility to return the premises to the Landlord sufficiently ready to lease to the next tenant.

Milliken's communication patterns became dysfunctional. Landlord, being closer, and having the reversionary long-term interest and a much greater interest in finding out the true condition of the building, was much more concerned, diligent, and engaged in building analysis and repair. Milliken minimized any problems with the building; the cost of needed repairs to comply with the lease; and the time which would be needed for repairs. The direct communication between parties ended in July 2019 when CCP's lawyer made a demand on Milliken.[17]

## Weight Given Evidence and Testimony

Milliken's evidence and testimony generally has less weight and credibility than that of CCP. Factors include Milliken's relative detachment from the Premises; lack of authoritative management on site for the last 18-24 months; failures to disclose the actual facts and dates of equipment staging for resale; unreliable positions taken in minimizing damage, proposing ineffective repairs and promising performance by changing deadlines in the last six month of the lease; mis-statements about the presence of and work of its contractors in that time period; failure to obtain consent to significant alterations; abuse of the Premises by the treatment of the Mezzanine and Tilt Up walls; and concealment of the damage to Mezzanine and Tilt Up walls.

Beyond these deficiencies in performance under the lease, from July 2019 and in litigation, Milliken made faulty arguments on fundamental lease provision including those about repair, maintenance, and restoration; the default process; and attorneys' fees. Some of these are pointed out in the determinations of liability.

## Determinations of Liability

**Milliken breached its duty to repair and maintain**

Milliken reads the Lease Agreement wrong when considering its responsibilities to maintain and repair. It relies on Section 18 of the Lease Agreement.

> On the last day of the term of this Lease or any extension thereof, or upon sooner termination, Tenant shall quit and surrender the Premises and the improvements then remaining thereon, and Tenant shall leave the Premises and any improvements in operable, clean and good condition, ordinary wear and tear excepted.

Reliance on this Section is misplaced. And two results of the erroneous reliance are that

---

[16] Ex 26.

[17] Ex. 41.

    a. Milliken believes in *an erroneous deadline*:

> Milliken could only "default" if it failed to preserve the Premises and make necessary repairs that Milliken (as opposed to CCP) was responsible for under the Lease Agreement before the expiration of its lease term.[18]

    b. Milliken advocates *an erroneous standard of work*. Milliken repeatedly relies on Section 18 (regarding surrender at end of lease term) to claim it was only required to "leave the Premises and any improvements in operable, clean and good condition, ordinary wear and tear excepted."[19]

**The time for repairs and maintenance**, under Section 16 of the Lease Agreement, is actually "at all times;" "as and when needed" and "promptly."

> **At all times** during the term of this Lease . . .Tenant shall maintain the fixtures, equipment and appurtenances thereon, and at its sole cost and expense, make all repairs of any nature thereto **as and when needed** to preserve the Premises in good condition.

> [A]ll damage or injury to the Premises and to its fixtures and appurtenances shall be repaired **promptly** by Tenant, at its sole cost and expense.

The **standard for repairs and maintenance**, under Section 16 of the Lease Agreement, is actually "a condition substantially equivalent to the status of the Premises on the Commencement Date."

> All aforesaid repairs, restorations and replacements shall leave the Premises in a condition **substantially equivalent to the status of the Premises on the Commencement Date.**

Section 18, which flows after Section 16, assumes compliance with Section 16. Ordinary wear and tear since the last timely maintenance and repair would be relatively insignificant.

It seems lost on Milliken that Section 16 gave it the primary duty to make repairs and maintain the premises. Milliken breached this duty during the lease, possibly as early as 2007 (when the third authorization was drafted and alterations made).The duty was breached throughout the lease when repairs were not made. The duty was also breached at the end of the lease term when restoration of the premises was not timely made.

The breaches only became known to CCP when it gained access in July 2019, though email made it aware of the failed office air conditioner in late summer 2018.

**Milliken breached its duty to give CCP access during the lease**

Mr. Hestehave testified that when he came to the building, he was able to drive around it but not enter. Mr. Hestehave asked to enter while the plant was in production but was told that he could not. At his deposition, he heard a remark that this instruction "sounded like Roger Milliken," meaning a policy he followed. Milliken's examination of Hestehave at trial raised his failure to

---

[18] Milliken Trial Brief ("MTB") at 15.

[19] MTB at 7, 11, 12, 15, and 24.

obtain legal counsel or file suit for access as some sort of defense. This is not necessary under the Lease Agreement.

Section 16 includes the Landlord's right to cure failures to repair, which necessarily requires entry for inspection and repairs.

> If Tenant should default in performance of Tenant's obligations under this Paragraph, and such default continues for more than thirty (30) days after receipt by Tenant or written notice of such default from Landlord, which notice shall specify in detail the nature of the default, Landlord may perform Tenant's obligations under this section and any amount so expended shall be deemed additional rent due Landlord under this Lease.

Milliken denied CCP the right to enter and inspect until July 2019, and then did not permit access again for many months.

### Milliken made unauthorized alterations, some of which impaired the structural integrity of the building

Milliken relies on the unsigned Authorization draft Ex. 4 to justify the listed alterations. An unsigned authorization, with no evidence that it was ever seen by CCP before litigation, does not constitute a valid authorization. Thus, all the penetrations of the Tilt Up walls were unauthorized and violated the lease. These alterations were unknown to CCP until July 2019 because inside inspection had been barred and outside view was concealed by the unauthorized 46x48 metal building.

The penetration of the Tilt Up walls impaired the structural integrity of the building. (Ex. 36, 45, 49, 52, 93, 226. Under no circumstances would this be permitted under Section 14 which prohibited alterations that impaired the structural integrity of the building. A lease amendment would have been required. No such amendment exists.

### Milliken's penetrations of the Tilt Up walls and abuse of the mezzanine constitute waste

Utah's waste statute states: "If a guardian, tenant for life or years, joint tenant, or tenant in common, of real property commits waste on the property, any person aggrieved by the waste may bring an action against the person. Judgment in the action may include treble damages."[20]

The three elements for a waste claim are: "(1) an act constituting waste, (2) the act must be done by one legally in possession, and (3) the act must be to the prejudice of the estate or interest therein of another."[21] Waste has been generally defined as "the destruction, misuse, alteration, or neglect of premises"[22]

The abuse of the Mezzanine by water damage; the damage to Tilt Up walls by penetration (without any engineering studies beforehand); and the damage to the loading dock impaired the

---

[20] Utah Code Ann. § 78B-6-1001. The statute was previously codified at Utah Code Ann. § 78-38-2.

[21] *Eleopulos v. McFarland & Hullinger, LLC*, 145 P.3d 1157, 1159 (Utah Ct. App. 2006) (citing *Oquirrh Assocs. v. First Nat'l Leasing Co.,* 888 P.2d 659, 664 (Utah Ct. App.1994)); *see also Mountain Dudes, LLC v. Split Rock, Inc.*, No. 2:08-CV-940-CW, 2011 WL 1549425, at *13 (D. Utah Apr. 20, 2011).

[22] *Hansen v. Green River Grp.*, 748 P.2d 1102, 1106 (Utah Ct. App. 1988).

structural integrity of the Premises.[23] Those actions are clearly commissive waste.[24] Milliken paid the substantive sums due for the Mezzanine and Tilt Up wall repairs and thereby avoided an assessment of damages for waste and a damages multiplier up to treble damages for those items.

**Milliken is rightfully charged with the office HVAC unit replacement**

The office HVAC unit was known to have failed by September 2018, three years before the end of the lease term. It was not operable when the lease ended. There were multiple recommendations to replace rather than repair the unit. The lack of Milliken maintenance records and the cessation of production at the building are probative of a lack of repair. Though there was some evidence repair was less costly. There is not proof that repair was viable. The HVAC office unit was Milliken's responsibility under Section 16 of the Lease. Specifically, Milliken was required to "maintain the fixtures, equipment and appurtenances thereon" and to maintain the premises in a manner "substantially equivalent to the status of the Premises on the Commencement Date."

The failure to maintain the office HVAC unit is permissive waste, but recoverable for breach of Milliken's duty to maintain and repair. Because it is permissive waste, the claim does not support a damages multiplier.[25]

**Milliken is responsible for six weeks Rent Abatement**

The record is rife with evidence of delays caused by Milliken's:

- hardline responses to CCP's letters;
- delays in committing to take action;
- equivocation about who would take responsibility for repairs (which is ironic considering Milliken's almost wholesale failure to make repairs when required under the Lease Agreement);
- instructions to CCP to not attempt repairs;
- incremental abdication of its duty to repair;
- delays in permitting access;
- undisclosed extensions of time for the equipment buyer to occupy the premises;
- failures to complete repairs it committed to make;
- proposals of unqualified methods and contractors;
- incomplete work by Milliken contractors;
- failures to have contractors complete work on site when necessary for CCP's contractors to move ahead;
- denials of problems caused by its contractors' failures; and
- insistence on unreasonably short timeframes.

---

[23] Ex. 36, 45, 49, 52, 93, 226.

[24] *Fisher Properties, Inc. v. Arden-Mayfair, In*c., 106 Wash.2d 826, 852-854 (1986).

[25] *Id.*

Milliken repeatedly caused delays to full occupancy by CCP's successor tenant. This easily caused at least two months of delay in having the premises fully ready for the successor tenant. However, a superseding cause intervened July 15, 2021. While factors caused by Milliken still impaired Czarnowski's full access and use of the premises, rain and a leaky roof were more of an issue by that point. Therefore, rent abatement damages will be limited to 1.5 months.

**CCP provided notices of breach sufficient to trigger the 10% late fee**

Several letters notify Milliken of amounts due.[26] Any notice of a sum that is due is sufficient to trigger the 10% late fee under Section 29, even without mentioning it.

> In the event any payment of rental or other sum due hereunder is not paid as and when due and Tenant fails to cure such default within ten (10) days after written demand from Landlord, a late fee equal to ten (10%) percent of the amount past due shall be assessed and shall become immediately due.

The letter dated January 21, 2022, clearly demanded the late fee be paid with regard to certain items then due, mentioning Section 29.[27]

**CCP made no waiver**

Milliken claims CCP made waivers by:

- Not mentioning the loading dock in CCP's January 2022 Ten Day Demand. (Ex. 193);[28] and
- "[P]re-litigation statements that Milliken 'would be' in default, as opposed to 'was in' default . . . ."[29]

These actions were not waivers. CCP never manifested in intention to relinquish a right. Asserting one right does not relinquish another right. "To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it."[30]

The facts show that CCP never manifested an intention to relinquish any right. "[W]aiver is an intensely fact dependent question."[31] "[A] fact finder should assess the totality of the circumstances to determine whether the relinquishment is clearly intended."[32] The letters CCP sent to Milliken make clear that Milliken was notified of current deficiencies in performance.

---

[26] Ex. 36, 97, 118, and 193.

[27] Ex. 193.

[28] MTB at 6; Defendant Milliken & Company's Proposed Findings of Fact and Conclusions of Law ("Milliken FFCL") at 48-50, docket no. 123, filed June 14, 2024.

[29] MTB at 18; Milliken FFCL at 52. Several CCP letters speak of default in the present tense, including Ex. 41, 97, 118.

[30] *Geisdorf v. Doughty*, 972 P.2d 67, 72 (Utah 1998).

[31] *IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 196 P.3d 588, 594 (Utah 2008) (internal quotations omitted).

[32] *Geisdorf*, 972 P.2d at 72.

Milliken has also failed to show that any prejudice accrued to it as a result of its misreading of clear letters.[33]

**Milliken's payments and letters do not constitute settlements or complete cures**

Milliken has plead payment and settlement as a defense. The payments are credits, but there is no settlement. Milliken's letters specifically contemplated a future settlement.[34] But, a settlement never occurred.[35]

## Questions and Discussion Friday July 5, 2024

To conclude issues in Phase I of the trial, on Friday July 5, 2024, discussion will resolve the following questions.

**Who is the loading dock damage attributable to?**

The preponderance of evidence is that the loading dock damage was due to dropped trailers driven by third party drivers delivering goods to Milliken.

Under a waste theory who has the responsibility?

Under the lease who has the responsibility for this damage?

> **SECTION 17. Landlord Obligations:** During the term of this Lease and any extensions thereof, Landlord shall, at Landlord's sole cost and expense, maintain in good order and repair the exterior and structural supports of the Facility, including without limitation the walls, foundation, roof, structural supports, sidewalks, water, sewer and other utility lines located outside of the Facility, ordinary wear and tear excepted; provided, however, that **Landlord shall have no such obligation or liability of any kind for foundation problems or deficiencies caused by Tenant or Tenant's agents, contractors, employees, or invitees**.

Is the action of third-party drivers anything other than a negligence or waste claim against those drivers? It appears that Milliken has no outside duty of repair and that the landlord does not have a duty to repair invitee damage.

**Good faith and fair dealing**

> The implied covenant of good faith and fair dealing inheres in most contractual relationships and requires a party in a contract to perform consistent with the agreed common purpose and the justified expectations of the other party. This is recognized where it is clear from the parties' 'course of dealings' or a settled custom or usage of trade that the parties undoubtedly would have agreed to the covenant if they had considered and addressed it. One such duty is

---

[33] *McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 307 P.3d 650, 654 (Utah Ct. App. 2013).

[34] Ex 72A, 119, 133, 194.

[35] Tr. 700:24 -701:15.

an "implied duty that contracting parties 'refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract.'"[36]

What covenant is missing in the lease document that is supplied by the implied covenant of good faith and fair dealing?

What element of damages not supplied by other theories is supplied by finding a breach of an implied obligation?

**The Issue of Interest**

What is the effect of Utah Code Ann. § 15-1-1(2)?

**Damages**

We will review parties' damages submissions to determine positions on disputed elements of damage.

**Phase II Preparation**

Should determination of attorneys' fees proceed mostly by proffer and argument?

Signed July 4, 2024.

BY THE COURT

David Nuffer
United States District Judge

---

[36] *Cheney v. Hinton Burdick Hall & Spilker, PLLC,* 2015 UT App 242, ¶ 17, 366 P.3d 1220, 1225 (cleaned up).